Filed 9/18/23  P. v. Clapps CA3

## NOT TO BE PUBLISHED

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE, | C096554 |
| Plaintiff and Respondent, | (Super. Ct. No. 20FE009190) |
| v. | |
| EUGENE CLAPPS, | |
| Defendant and Appellant. | |

Following a bench trial as requested by defendant Eugene Clapps, the trial court found defendant guilty of attempted murder, aggravated mayhem, mayhem, assault with a deadly weapon in prison, and assault likely to cause great bodily injury.  The trial court found true enhancement allegations that defendant personally inflicted great bodily injury and used a deadly and dangerous weapon, and it also found that he had two prior strike convictions.  The trial court sentenced defendant to 27 years to life for attempted murder, plus five years for the great bodily injury enhancement, and imposed but stayed sentences on the remaining convictions.

1

Defendant now contends (1) the mayhem conviction must be dismissed because it is a lesser included offense of the aggravated mayhem conviction, and (2) substantial evidence does not support the finding that his prison-issued boots were deadly weapons.

Finding merit only in the first contention, we will reverse the mayhem conviction and otherwise affirm the judgment.

BACKGROUND

Correctional Officer Michael Carey supervised the move of inmate R.R. into defendant's cell the morning of February 16, 2020. R.R. was five feet five inches tall and weighed 125 to 130 pounds; defendant was about six feet tall and weighed about 230 pounds. Prior to the move, defendant told Officer Carey he was fine with the move.

As R.R. went into the cell, defendant shook his hand, gave him a little pat on the back, and went into the cell with him. The cell door closed behind them. About 30 minutes later, another correctional officer notified Officer Carey about erratic movements and banging sounds from the cell. When Officer Carey looked through the cell window, he saw defendant standing inside the cell uninjured. Officer Carey could not see R.R. When Officer Carey stepped closer to the window of the cell, he saw R.R. on the ground. R.R. was not moving, and there was some blood around his body. Defendant said he never touched R.R, that R.R. slipped and hurt his head on the toilet. Video surveillance showed defendant's head through the cell window moving aggressively up and down in jerking movements a couple minutes after the cell door had closed.

Officer Carey saw blood around R.R.'s face and head. R.R.'s head had an indentation the size of a softball and his left ear was missing or torn away. R.R. was unresponsive and he had trouble breathing. At the hospital, R.R. was diagnosed with severe traumatic brain injury. R.R. required a craniotomy, temporary brain drain, tracheostomy, and feeding tube. He had facial fractures and fractures on both sides of his skull, which could only occur with a significant amount of force. Upon discharge, R.R. was in a vegetative state.

2

Defendant testified he had prior problems with R.R.  He said R.R. spent time with three or four other gang members.  While they never hurt defendant, the group walked by defendant's cell acting as if they had razor blades in their mouths and knives in their pockets.  Defendant moved from his prior prison housing to get away from them.  Despite these prior negative experiences, defendant accepted R.R. as his new roommate because he believed refusing the assignment would adversely impact his release date.

Defendant testified R.R. was disrespectful when he came into the cell.  According to defendant, R.R. called him a bitch and attacked him.  Defendant claimed he wrestled R.R. to the ground in self-defense, and as soon as R.R. stopped, defendant stopped.  When asked if he stomped or kicked R.R., defendant responded, "Anything I've done was self-defense to the ultimate max, sir."  But at a preliminary proceeding, defendant said: "I murdered him.  I killed him.  I'm not innocent.  I'm the one that killed him.  I stomped him to death and any motherfucker that step on me, I'll kill that motherfucker, too."  He added:  "I'm the one who stomped his mother fucking brain in the concrete.  Any mother fucking step, I kill his mother fucking ass too.  I'm guilty.  [¶]  This is the trial.  We don't need to go to trial.  I'm guilty right now.  I stomped him to fucking death, and I killed him -- or damn near killed him. . . .  I'm guilty."  At trial, the prosecution introduced photographs of the boots defendant had been wearing, which had thick rubber soles.

Following a bench trial, the trial court found defendant guilty of attempted murder (Pen. Code, §§ 664/187, subd. (a)),[1] aggravated mayhem (§ 205), mayhem (§ 203), assault with a deadly weapon in prison (§ 4501, subd. (a)), and assault likely to cause great bodily injury in prison (§ 4501, subd. (b)).  It found true enhancement allegations that defendant personally inflicted great bodily injury and used a deadly and dangerous

---

[1] Undesignated statutory references are to the Penal Code.

weapon (§§ 12022.7, subd. (b), 12022, subd. (b)(1)), and it also found that he had two prior strike convictions.

The trial court sentenced defendant to 27 years to life for attempted murder based on defendant's third-strike status, plus a consecutive five years for the great bodily injury enhancement. The trial court imposed but stayed sentences on the remaining convictions.

DISCUSSION

I

Defendant contends we must dismiss his mayhem conviction because it is a necessarily lesser included offense of the aggravated mayhem offense. The People agree the conviction should be reversed.

"When a defendant is found guilty of both a greater and a necessarily lesser included offense arising out of the same act or course of conduct, and the evidence supports the verdict on the greater offense, that conviction is controlling, and the conviction of the lesser offense must be reversed." (*People v. Sanders* (2012) 55 Cal.4th 731, 736.) Simple mayhem is a necessarily included lesser offense of aggravated mayhem. (*People v. Robinson* (2014) 232 Cal.App.4th 69, 79.) Thus, defendant's conviction for mayhem must be reversed.

II

Defendant next contends we should reverse his conviction for assault with a deadly weapon because substantial evidence does not support a finding his prison-issued boots were deadly weapons.

"As used in section 245, subdivision (a)(1), a 'deadly weapon' is 'any object, instrument, or weapon which is used in such a manner as to be capable of producing and likely to produce, death or great bodily injury.' [Citation.] Some few objects, such as dirks and blackjacks, have been held to be deadly weapons as a matter of law; the ordinary use for which they are designed establishes their character as such. [Citation.] Other objects, while not deadly per se, may be used, under certain circumstances, in a

4

manner likely to produce death or great bodily injury. In determining whether an object not inherently deadly or dangerous is used as such, the trier of fact may consider the nature of the object, the manner in which it is used, and all other facts relevant to the issue. [Citations]" (*People v. Aguilar* (1997) 16 Cal.4th 1023, 1028-1029 (*Aguilar*).)

In *Aguilar*, the California Supreme Court held that bare hands and bare feet were not deadly weapons (*Aguilar, supra*, 16 Cal.4th. at p. 1034), but added: "There can be no doubt that some footwear, such as hobnailed or steel-toed boots, are capable of being wielded in a way likely to produce death or serious injury, and as such may constitute weapons within the meaning of section 245, subdivision (a)(1)." (*Id.* at p. 1035.)

Other courts agree: "A shod foot [a shoed foot] is not a weapon in the strict sense. But it is capable of being so used." (*People v. Wood* (1961) 192 Cal.App.2d 393, 396; see *People v. Bennett* (1962) 208 Cal.App.2d 317, 320 (*Bennett*).) In *Wood*, the court concluded the defendant's shod foot was "dangerous and might well be a lethal weapon" when he caused a deep gash in the victim's neck. (*Wood,* at p. 397.)

Defendant argues his boots were not deadly weapons because they were prison-issued and not steel-toed or hobnailed. But it was the manner in which he used his boots and the resulting serious and potentially lethal injuries they caused that support the trial court's finding the boots were used as deadly weapons. As the Supreme Court stated in *Aguilar*, "While evidence is lacking regarding the type of footwear worn by the four assailants, that they were shod is not disputed. This fact, together with evidence concerning the circumstances of the assault, thus provides some evidence from which the jury could find the assailants wielded their shod feet in a manner capable of producing, and likely to produce, death or great bodily injury." (*Aguilar, supra*, 16 Cal.4th at p. 1035, italics omitted.) In *Bennett, supra*, 208 Cal.App.2d at page 320, the appellate court concluded photographs of the severe nature of the injuries caused by the defendant's shod feet were relevant for the jury to determine if defendant used his shoes as deadly weapons.

Here, substantial evidence supports the trial court's determination that defendant utilized his boots as deadly weapons. It is undisputed defendant had prison boots on his feet when he stomped and kicked R.R.'s head, causing an indentation, tearing off his ear, putting him into a coma, and leaving him in a vegetative state. The boots allowed defendant to inflict significant damage to R.R. Sufficient evidence supports the trial court's conclusion that defendant wielded his shod feet as deadly weapons and in a manner that caused great bodily injury.

Defendant's contention lacks merit.

## DISPOSITION

The mayhem conviction is reversed. The judgment is otherwise affirmed.


_____/S/_____
MAURO, J.


We concur:


_____/S/_____
ROBIE, Acting P. J.


_____/S/_____
BOULWARE EURIE, J.