Filed 2/25/21  In re S.S. CA3

NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(El Dorado)

----

| | |
|---|---|
| In re S.S., a Person Coming Under the Juvenile Court Law. | C090348 |
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>S.S.,<br><br>Defendant and Appellant. | (Super. Ct. No. PDL20180035) |

The juvenile court sustained two counts of assault by means of force likely to produce great bodily injury, and minor S.S. admitted to committing battery and resisting a peace officer.  On appeal, the minor contends:  (1) the juvenile court erred when it held her delinquency petition in abeyance after determining an out-of-state dependency placement was in her best interests, and (2) there was insufficient evidence to convict her

1

of assault by means of force likely to produce great bodily injury. We disagree and shall affirm the judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

In May 2018 Emily Dawes and Kathryn Fisher were working as residential skills coaches at the group home where the minor had been placed. Summitview Child and Family Services was a level 14 group home providing the most restrictive type of environment and the highest level of care for its residents. On May 5, 2018, the minor had run away from the home and was brought back on the following day. She was upset and went to her room, becoming confrontational later in the day. Recalling the minor's history of self-harm, Dawes checked on the minor in her room and saw her sitting on her bed with a thumbtack nearby. While the minor made a phone call, Dawes removed the thumbtack from her room. When the minor returned, Dawes told the minor she had removed the thumbtack for the minor's safety. The minor then began yelling and walked out the front door of the house. Pursuant to the group home's policy, Dawes followed the minor out the door and watched her. Fisher saw the minor "getting in [Dawes's] face being confrontational," causing Dawes to step back as they had "a back-and-forth verbal exchange."

When the minor left the property and went out onto the street, Fisher called 911. While Dawes followed the minor from about 15 feet away, the minor threatened to fight Dawes. Dawes "backed off," gave the minor space, and "[t]ried to give her some skills coaching" to no avail. As Dawes continued to follow her, the minor turned around and walked back towards the residence. Dawes moved closer to the minor, getting within five feet, as the minor seemed calmer.

Fisher informed Dawes over the radio that the police were on the way. When the minor heard that, she turned to Dawes and said, " 'I'm going to kick your ass before they get here.' " The minor began kicking Dawes's feet. At that point, Dawes was alone with the minor. The minor started making punching motions toward Dawes's face, so Dawes

2

put her hands up to protect herself. Dawes told the minor she did not want to fight her and if the minor returned to the house and calmed down, the staff could let law enforcement know they did not need assistance, but the minor continued to threaten to beat Dawes up, and swung at Dawes with her fist. The minor's swings contacted Dawes's arms because she had them up in a defensive position over her face but did not contact the rest of Dawes's body.

The minor then began picking up rocks and big chunks of asphalt from the driveway and coming towards Dawes with them. Dawes estimated the smaller rocks were an inch or two in diameter, while the bigger rocks were five or six inches or larger in diameter. From about 10 to 15 feet away, the minor threw the rocks at Dawes. Holding the rocks in her hands, the minor also swung at Dawes from a little less than an arm's length away. Fisher saw the minor alternate between running up to Dawes and punching her, then stepping away and picking up rocks to throw at Dawes. Fisher saw the minor initially picking up smaller rocks, around the size of a fist, but the rocks that the minor picked up gradually became bigger, such as larger chunks of asphalt. Fisher thought these larger asphalt pieces were so heavy that they were "dangerous" and "could have knocked [her or Dawes] out." Fisher estimated the asphalt pieces were about the size of an 8 ½ by 11-inch binder, so large that the minor had to carry them with two hands as she ran at Dawes and Fisher.

At some point, Fisher joined Dawes and the minor on the driveway. As the minor threw the rocks, Dawes made her way up the driveway and told her staff to go into the house. The minor continued to follow Dawes and Fisher and throw rocks. The two moved backwards, facing the minor, and Dawes continued dodging because the minor was still aiming most of the rocks at her. The minor then ran past Dawes and aimed at Fisher with a large rock, commenting to Dawes that, " 'I already hit you, Bitch.' " Fisher turned her back and started running toward the residence, so Dawes ran to cut the minor off and get between her and Fisher. The minor said she had "unfinished business," tried

3

to run around Dawes and, with two hands, forcefully threw a rock at Fisher from a few feet away, but it did not hit her. As Fisher and Dawes moved around the corner to get into the house, the minor ran out of rocks and began swinging at Dawes. As Dawes looked over her shoulder to see if Fisher had made it to the door, the minor came over and hit Dawes on top of her head with a closed fist. Fisher saw the minor land this punch on Dawes's forehead.

The rocks the minor threw hit Dawes's body at least three times, and Dawes had marks on her left thigh, shoulder, and on her right side as a result of the incident. Fisher estimated the minor threw at least 10 small rocks and at least 10 larger rocks. Fisher observed two small rocks contact Dawes's upper body and two big rocks contact Dawes's chest and lower leg. Dawes also sustained an injury on her head where the minor had hit her with her fist. Dawes's injuries consisted of bruising and a scratch, and she declined medical attention that day. Dawes pointed out to police one of the rocks that the minor had thrown at her, which was collected and admitted into evidence. Fisher testified: "All of the rocks [the minor threw] were thrown with force." Fisher could tell by the way the minor's body moved and how she carried and threw the rocks that "she was aiming deliberately to hit" herself and Dawes. The rocks "would move very fast through the air, despite being heavy," and "ma[de] loud noises when they hit the ground."

On May 8, 2018, the El Dorado County District Attorney filed a petition under Welfare and Institutions Code section 602, subdivision (a),[1] alleging in counts I and II that the minor committed assault by means of force likely to produce great bodily injury (Pen. Code, § 245, subd. (a)(4)); in count III that the minor committed battery (*id*., § 242); and in count IV that the minor resisted a peace officer (*id*., § 148, subd. (a)(1)).

---

[1] Undesignated statutory references are to the Welfare and Institutions Code.

On May 9, 2018, the minor was detained on the petition and denied all of the allegations. That same day, the juvenile court granted defense counsel's request for a section 241.1 hearing.[2] At the hearing, the minor's delinquency attorney stated that the proposed dependency placement in Wyoming was "a unique opportunity," "[his] client would like to take it," and if the placement did not "work," there was nothing to suggest that the prosecutor "would have any more difficult of a time pursuing [the minor's] delinquency matter six months to a year" later. The remaining parties submitted on the recommendation. Following the section 241.1 hearing, the court determined the minor would remain a section 300 dependent and be placed out of state in Wyoming. The court also ordered the section 602 delinquency petition to be held in abeyance. The court stated: "The Court will allow Child Welfare to continue to be the lead agency, which means that if [the minor] doesn't do this, this petition comes back into play. And don't expect that the second time I'm going to keep her a dependent."

On November 13, 2018, the Los Angeles District Attorney filed a second amended juvenile wardship petition alleging in count 1 that the minor committed assault by means of force likely to produce great bodily injury (Pen. Code, § 245, subd. (a)(4)), and in count 2 that the minor committed battery with serious bodily injury (*id.*, § 243, subd. (d)). As to count 1, it was further alleged that the minor personally inflicted great bodily injury. (*Id.*, § 12022.7, subd. (a).) The minor admitted count 2 and count 1 was

---

[2] Section 241.1, subdivision (a), provides: "Whenever a minor appears to come within the description of both Section 300 and Section 601 or 602, the county probation department and the child welfare services department shall, pursuant to a jointly developed written protocol described in subdivision (b), initially determine which status will serve the best interests of the minor and the protection of society. The recommendations of both departments shall be presented to the juvenile court with the petition that is filed on behalf of the minor, and the court shall determine which status is appropriate for the minor."

dismissed.  The same day, the minor's case was ordered transferred out to El Dorado County for disposition.

After an additional section 241.1 hearing, the court ordered the dependency jurisdiction terminated and resumption of the delinquency proceedings.  After a contested jurisdiction hearing on the first petition, the juvenile court sustained counts I and II, and the minor admitted counts III and IV.

On August 5, 2019, the juvenile court entered a disposition order committing the minor to juvenile hall.  The court declared the minor a ward of the court and determined her maximum period of confinement was six years six months.

The minor filed a timely notice of appeal.

DISCUSSION

I

*Abeyance Order*

The minor first contends the juvenile court abused its discretion by holding her first delinquency petition in abeyance after determining dependency was in her best interests at the section 241.1 hearing.  She asserts the abeyance order was clear error warranting dismissal of the delinquency petition.  The Attorney General contends the claim is forfeited by the minor's failure to object below.  We agree the claim is forfeited.

"In California, the juvenile court's jurisdiction over a minor can be invoked in two ways:  (1) by a dependency petition (§ 300), which alleges the child's home is unfit due to parental abuse or neglect; or (2) by a delinquency petition, which accuses the child of either disobedience or truancy (§ 601) or the violation of a law that defines a crime (§ 602)."  (*In re W.B.* (2012) 55 Cal.4th 30, 42.)  "In the broadest sense, adjudications under section 300 are 'dependency' proceedings, and adjudications under sections 601 and 602 are 'delinquency' proceedings.  When the juvenile court assumes jurisdiction over a child under section 601 or 602, the minor is described as a 'ward' of the court."  (*Id.* at p. 43.)  "As a general rule, a child who qualifies as both a dependent and a ward of the juvenile

6

court cannot be both." (*In re M.V.* (2014) 225 Cal.App.4th 1495, 1505-1506, citing, § 241.1, subd. (d).) "Instead, section 241.1 sets forth the procedure that the juvenile court must follow when faced with a case in which it may have dual bases for jurisdiction over a minor." (*M.V.*, at p. 1506.)

"We review the juvenile court's determination under section 241.1 for abuse of discretion. [Citation.] 'To show abuse of discretion, the minor must demonstrate the juvenile court exercised its discretion in an arbitrary, capricious or patently absurd manner that resulted in a miscarriage of justice.' [Citation.] Throughout our analysis, we will not lightly substitute our decision for that rendered by the juvenile court. Rather, we must indulge all reasonable inferences to support the decision of the juvenile court and will not disturb its findings where there is substantial evidence to support them. [Citation.]" (*In re M.V., supra*, 225 Cal.App.4th at pp. 1506-1507.)

Here, we conclude the minor forfeited her claim that the juvenile court abused its discretion in ordering the minor to remain a section 300 dependent and holding the delinquency petition in abeyance. All of the parties and the juvenile court considered and agreed to the decision. The minor's dependency attorney emphasized that proceeding with dependency rather than with delinquency was in the minor's best interests because her access to appropriate services might be limited if she was declared a ward. The minor's attorneys did not at any point object and indeed, advocated the decision reached by the court. Accordingly, the claim is forfeited. (See *In re S.B.* (2004) 32 Cal.4th 1287, 1293 [juvenile matters are not exempt from the forfeiture rule]; see also *In re Aaron S.* (2015) 235 Cal.App.4th 507, 521, quoting *Caminetti v. Pacific Mut. Life Ins. Co. of Cal.* (1943) 22 Cal.2d 386, 392 [forfeiture rule keeps a party from playing " 'fast and loose with the administration of justice by deliberately standing by without making an objection of which he is aware and thereby permitting the proceedings to go to a conclusion which he may acquiesce in, if favorable, and which he may avoid, if not' "].)

The minor did not address the issue of forfeiture in her opening brief or file a reply brief responding to the Attorney General's forfeiture argument or asking this court to exercise its discretion to consider the merits despite the forfeiture. (See *People v. Williams* (1998) 17 Cal.4th 148, 161, fn. 6, 162.) We see no basis to depart from the forfeiture rule and exercise our discretion to consider the merits of the claim.

II

*Sufficiency of the Evidence*

Next, the minor asserts there was insufficient evidence to support her two convictions for assault by means of force likely to cause great bodily injury based on the incident involving Dawes and Fisher. We disagree.

Penal Code section 245, subdivision (a)(4) provides as relevant here that "[a]ny person who commits an assault upon the person of another by any means of force likely to produce great bodily injury shall be punished . . . ." "The term 'great bodily injury' as used in the felony assault statute means significant or substantial bodily injury or damage . . . ." (*People v. Duke* (1985) 174 Cal.App.3d 296, 302.) "[I]t does not refer to trivial or insignificant injury or marginal harm." (*Ibid*.) "One may commit an assault without making actual physical contact with the person of the victim; because the statute focuses on . . . force *likely* to produce great bodily injury, whether the victim in fact suffers any harm is immaterial." (*People v. Aguilar* (1997) 16 Cal.4th 1023, 1028 (*Aguilar*).) "[A]lthough it is appropriate to consider the injury that could have resulted from the way the object was used, the extent of actual injury or lack of injury is also relevant." (*In re B.M.* (2018) 6 Cal.5th 528, 535.) While a conviction for assault with a deadly weapon does not require proof of injury or even physical contact, "limited injury or lack of injury may suggest that the nature of the object or the way it was used was not capable of producing or likely to produce death or serious harm." (*Ibid.*)

In assessing the sufficiency of the evidence, we "review the entire record in the light most favorable to the judgment to determine whether it discloses evidence that is

8

reasonable, credible, and of solid value such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." (*People v. Johnson* (1980) 26 Cal.3d 557, 578; *People v. Hill* (1998) 17 Cal.4th 800, 848.) We may not reweigh the evidence or substitute our judgment for that of the trier of fact. (*People v. Ochoa* (1993) 6 Cal.4th 1119, 1206.) "[O]ur opinion that the evidence could reasonably be reconciled with a finding of innocence or a lesser degree of crime does not warrant a reversal of the judgment." (*Hill*, at p. 849.) Reversal for insufficient evidence is required only if it appears that upon no hypothesis whatever is there sufficient substantial evidence to support the conviction. (*Johnson*, at p. 578.)

While the minor argues that the lack of severe injuries shows the force used was not likely to produce great bodily injury, we are not persuaded. (Cf. *People v. Hahn* (1956) 147 Cal.App.2d 308, 309-312 [evidence showing that the defendant hit the victim on the back of the head with an empty beer can was sufficient to establish assault with force likely to produce great bodily injury even though head wound did not require sutures or any follow-up treatment].) The fact that the victims' injuries were ultimately not more serious does not mean the force exerted was not *likely* to cause great bodily injury. Although the severity of an injury is probative, it is not dispositive. (*People v. Armstrong* (1992) 8 Cal.App.4th 1060, 1065-1066.) Indeed, no injury to the victim is required to sustain an assault with force likely to produce great bodily injury conviction. (*Aguilar, supra*, 16 Cal.4th at p. 1028 [whether the victim in fact suffers any harm is immaterial].)

Here, the evidence showed that Dawes was injured, suffering multiple bruises from at least three rocks. Based on the victims' extensive testimony, the minor repeatedly and forcefully threw large rocks and chunks of asphalt directly at the victims from close by. Fisher thought these larger asphalt pieces were so heavy that they were "dangerous" and "could have knocked [her or Dawes] out." Fisher estimated the asphalt pieces were about the size of an 8 ½ by 11-inch binder, so large that the minor had to

9

carry them with two hands as she ran toward Dawes and Fisher. Such large rocks and pieces of asphalt could certainly cause serious bodily injury, particularly if they had contacted either of the victims' heads. The juvenile court could reasonably infer that, from the way the minor deliberately threatened, aimed, ran, swung, and threw the rocks at Dawes and Fisher, there was more than a mere possibility that Dawes and Fisher would suffer serious bodily injury had they not dodged the rocks. That the minor was not always successful in hitting the victims with the rocks does not mean that the force used was unlikely to produce great bodily injury. It is well established that "the use of hands or fists alone may support a conviction of assault 'by means of force likely to produce great bodily injury . . . .' " (*Aguilar, supra*, 16 Cal.4th at p. 1028.)

Under the circumstances of this case, the juvenile court could reasonably conclude that the force we have described was likely to cause great bodily injury. That the evidence might arguably be reconciled with a contrary finding does not warrant a reversal of the judgment given the parameters of our review. (*People v. Hill, supra*, 17 Cal.4th at p. 849.)

## DISPOSITION

The judgment is affirmed.

      /s/                   
Duarte, J.

We concur:


     /s/                 
Raye, P. J.


     /s/                 
Mauro, J.